**ILLINOIS CONSTRUCTORS CORPORATION, an Illinois corporation, Plaintiff,**

v.

**LOGAN TRANSPORTATION, INC., a Mississippi corporation, Defendant.**

No. 84 C 10775.

United States District Court, N.D. Illinois.

June 22, 1989.

Donald V. O'Brien, Kathleen A. O'Dekirk, Anne E. Schless and James R. Carr, O'Brien, Orourke, Hogan & McNulty, Chicago, Ill., for plaintiff.

Paul McCambridge, Tribler & Marwedel, Chicago, Ill., and Frank J. Dantone, Jr., Henderson, Duke & Dantone, P.A., Greenville, Miss., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

### I. INTRODUCTION

At approximately 11:50 p.m. on December 1, 1984, the towboat *M/V* [1] *Sunshine* was proceeding upstream on the Illinois River pushing a tow of eleven barges when it ran aground on a sandbar and, in the process of trying to extricate itself, hit a cofferdam situated on the north bank, causing $850,000 in damage. The owner of the cofferdam, Illinois Constructors Corporation (ICC), brought this admiralty suit against the owner of the vessel, Logan

---

1. Motor Vessel.

Transportation, Inc. (Logan), alleging that the pilot of the tow was negligent and that his negligence could be imputed to the owner. Logan concedes that the pilot was negligent, but claims that his negligence was not the sole proximate cause of the allision. According to the defendant, ICC had failed to install appropriate lighting and reflective tape on the cofferdam, as required by United States Coast Guard regulations; had ICC complied with these regulations, the defendant maintains, the pilot would have been able to sight the cofferdam and thereby avoid the allision. Therefore, the defendant asks that liability be apportioned on a comparative basis, with Logan deemed to be 60% at fault and the plaintiff 40%. In the alternative, the defendant asserts that the pilot's negligence cannot be imputed to it and that under well-established admiralty principles it is entitled to limit its liability to the value of the *M/V Sunshine* and its tow.

This action came to trial before this court, without a jury. The court observed each witness, took extensive and detailed contemporaneous trial notes of the testimony of each witness, and made specific determinations of the credibility of each witness and the weight to be given to the testimony.[2] The court has drawn what it believes to be the correct reasonable inferences from this evidence and has evaluated the applicable legal principles.

Based on all the testimony presented, the credibility of the witnesses and the weight to be given their testimony, the exhibits received in evidence, and the law governing this case, the court concludes that the pilot's negligence was the sole proximate cause of the allision and, therefore, that the owner is not entitled to exoneration. The court holds, however, that the owner itself was not negligent and therefore is

entitled to limit its liability to the value of the vessel. Accordingly, the court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[3]

## II. FACTS

### A. The Parties

The plaintiff, ICC, is an Illinois corporation with its principal place of business in Cook County, Illinois. ICC is, among other things, a general contractor for bridge and pier construction throughout Illinois and the midwestern states. At the time of the accident, ICC was under contract with the Illinois Department of Transportation as a general contractor for the construction of a bridge pier that would support a bridge spanning the Illinois River in LaSalle County, Illinois. Construction of the bridge pier involved the use of a "cofferdam," a watertight enclosure built into the riverbed and then pumped dry to facilitate the building of the pier. Made of steel sheeting and braced with steel beams, the cofferdam was located on the north bank of the river.

The defendant, Logan, is a Mississippi corporation with its principal place of business in Greenville, Mississippi.[4] Logan has been in the business of transporting materials on the western rivers, including the Illinois River, for approximately thirty years. At the time of the accident Hilman Logan was President of Logan Transportation, but he had assigned the responsibility of the day-to-day operation of the company to Donnie Willingham, the Marine Superintendent of Operations. Willingham's responsibilities included hiring and training competent crews and ensuring that Logan's vessels, including the *M/V Sunshine*, were seaworthy and properly equipped for the job.[5] Logan's policy was

---

2. In judging the credibility of each witness and the weight to be given his testimony, the court has taken into account for each witness his age, memory, intelligence, ability and opportunity to observe, manner while testifying, any interest, bias, or prejudice, and the reasonableness of the testimony considered in light of all the evidence in the case.

3. Any conclusion of law deemed to be a finding of fact is included as a true finding herein; likewise, any finding of fact deemed to be a conclusion of law is adopted as such.

4. Logan discontinued doing business in September 1987.

5. In fact, Willingham had operated the *M/V Sunshine* prior to the allision and had actual

to delegate navigational decisions, including the posting of lookouts, directly to the captains and pilots of its vessels, who were aware of the on-the-scene conditions. Willingham, however, was always available by VHF radio for consultation and recommendations; if there was a problem on any of Logan's vessels, each captain and pilot knew that he could call Willingham by radio and discuss the problem. Logan's policy of delegating navigational decisions to the pilothouse personnel, rather than attempting to run the boat from the office, conformed with the general practice in the towboat industry.

B. The *M/V Sunshine* and Its Crew

Constructed in 1966, the *M/V Sunshine* is a diesel-powered, triple screw inland river towboat of steel construction, weighing 420 gross tons and measuring approximately 100 feet in length and 30 feet in width, with a draft of approximately 9 feet forward and aft. It is powered by three diesel engines with a total horsepower of 2700.

Triple screw vessels such as the *M/V Sunshine* are easier to steer and maneuver than single or double screw vessels;[6] the *M/V Sunshine*, however, differs from other triple screw vessels in three respects. First, unlike the engines on other vessels, the *M/V Sunshine*'s engines are not aligned side-by-side; instead, two of the engines are lined up opposite each other on the port and starboard sides, and the center engine is four to five feet forward. Second, the *M/V Sunshine* carries two flanking rudders on the outside wheels only (with none on the center wheel), rather than carrying two flanking rudders on each wheel. Finally, the vessel's so-called "chimed hull" is not as wide or as long as those of other vessels. These minor differences, however, did not affect detrimentally the *M/V Sunshine*'s handling, maneuverability, or power. In fact, the *M/V*

*Sunshine*'s 2700 horsepower far exceeded the average for inland river towboats (approximately 1800–2200 horsepower), and its hull design allowed more water to get to the wheels, thereby providing for better steering and backing capability.[7]

Furthermore, Logan's vessels in general, and the *M/V Sunshine* in particular, were relatively clean and well maintained, and Willingham always responded quickly to any problem that would affect the safety of the vessel. At the time of the allision, all equipment and systems aboard the vessel were operating properly, including all electronic equipment—such as the radio-telephone,[8] radar, and swing meter—as well the steering system and main propulsion. On December 1, 1984, the *M/V Sunshine* and its freight then pending had a stipulated value of $200,000.

In addition to maintaining mechanically sound vessels, Logan also hired and trained competent crews to man the vessels. On the date of the accident the crew of the *M/V Sunshine* included the captain, Perry Wolfe; the pilot, Joe C. Williams, Sr.; the mate, Donnie Tacker; the chief engineer, Jerry Johnson; the assistant engineer, Joe Tingle; and three other deck hands and a cook.

Perry Wolfe was acting as captain aboard the *M/V Sunshine* the night of the allision. He began working on the rivers as a deckhand in 1957 and by 1961 was piloting vessels. For the next twenty-five years he worked for Logan on and off, and continuously from 1981 until Logan discontinued doing business in September 1987.

Wolfe had piloted many vessels on the Illinois River and was familiar with the river and the river boats. In particular, he was very familiar with the *M/V Sunshine*, having worked on the vessel 205 days in 1984 prior to the accident. A very compe-

---

knowledge of its handling characteristics and general maintenance.

**6.** Only 20% of the boats on the Illinois River are triple screw vessels.

**7.** The fact that the *M/V Sunshine* had in the past experienced groundings and allisions was no indication that it was unseaworthy, since such

accidents are fairly common along the Illinois River. *See infra* part VI.B.2.

**8.** The vessel was equipped with marine radios, which allowed communication between the vessel and the port captain and also between the vessel and other vessels and structures on the river.

tent navigator, he never had had any action taken against his license.

Joe Williams, who was piloting the vessel at the time of the allision, had a pilot's license that permitted him to navigate the western and inland rivers, including the Illinois River. Williams began steering on the Illinois River in 1967 and has operated primarily on the Illinois River for all but two years since that date. Williams was quite familiar with the *M/V Sunshine*, having worked on the vessel for approximately two years while at Logan and approximately two years when it was named the *M/V Hiawatha*.[9] In addition, Williams was familiar with the Illinois River in general and with the LaSalle Bridge area (including the sandbar) and the construction site in particular, having navigated safely past the area many times by the time of the accident.[10] In 1984 alone Williams piloted the *M/V Sunshine* northbound through the LaSalle Bridge area five times and southbound four times; for example, Williams safety navigated southbound through the general area on September 24, 1984; northbound through the area on November 8, 1984; and southbound through the area on November 23, 1984. In fact, given that construction of the cofferdam began in April or May 1984, Williams navigated the vessel and tow safely past the specific site three times: northbound on May 16, 1984; southbound on June 3, 1984; and northbound on June 12, 1984.

In short, Williams had extensive experience on the Illinois River in general and was very knowledgeable in particular about the construction underway at the time of the accident. Williams' familiarity with the Illinois River and the *M/V Sunshine* provided Logan with the opportunity of having not only an experienced navigator to pilot the vessel, but also a pilot who knew the vessel and how it handled.

The chief engineer, Jerry Johnson, was responsible for the general upkeep of the *M/V Sunshine*. Johnson had approximately ten to twelve years of engineering experience and was fully capable of handling the maintenance and repair of the vessel. Finally, the remaining crew members were experienced and fully capable of performing their job duties.

### C. The Scene of the Allision

#### 1. *Conditions on the Illinois River*

On December 1, 1984, the Illinois River in the vicinity of the cofferdam had an elevation of approximately 442 feet. The pool stage for the Peoria pool is 440 feet, which made the river at this point approximately two feet above pool at the time of the incident.[11] This elevation, however, is considered to be within normal limits, and there was no indication of any hazardous conditions near the site at the time of the incident. The estimated river current at the time was approximately 1–1½ m.p.h., with clear visibility and good weather conditions.

All upbound river traffic in this area encounters a sharp bend to the right, extending from the Shippingsport Bridge (Mile 224.7) to the I.C. Railroad Bridge (approximately Mile 225.5) to the cofferdam (Mile 225.7) and beyond to approximately Mile 226.5. Between the cofferdam on the north bank (located outside the navigable channel) and the south bridge pier lay approximately 590 feet of navigable water.

Between the I.C. Railroad Bridge and the cofferdam is a well-known sandbar situated on the right descending bank at the mouth of the Little Vermilion River, which flows into the Illinois River at approximately Mile 225.6. The configuration of the sandbar varies, depending upon the conditions of the river; consequently, the Coast Guard normally marks the sandbar with black buoys. On the night of the incident, however, there were no black buoys marking

---

**9.** In 1984, for example, Williams had piloted the vessel 123 days prior to the accident.

**10.** As was customary on this part of the river, during these trips Captain Williams did not employ additional lookouts on the bow of the tow unless the circumstances so warranted. *See infra* part II.D. Since the accident Williams has navigated safely past the site many times without incident.

**11.** More precisely, the river was 2.3 to 2.7 feet above pool at the time of the allision.

the sandbar, and there was only one red buoy marking the left descending shore in the vicinity of the job site.

## 2. *The Cofferdam*

The cofferdam was located along the right descending bank and was outside of the navigable channel. Constructed of reinforced steel sheeting driven vertically into the riverbed, the cofferdam was approximately 129 feet long and 45.5 feet wide, with the longer side running roughly parallel to the river bank.

Prior to the construction of the cofferdam, the Coast Guard had issued to ICC certain guidelines and conditions. The primary guideline required that "[a]ll work ... be so conducted that the free navigation of the waterway [would] not be unreasonably interfered with." In addition, further guidelines mandated that "[a]ll temporary structures ... be marked with lights, reflective material and buoys as prescribed by the United States Coast Guard." Specifically, these guidelines required that the upstream and downstream channelward corners of the cofferdam be marked with red lights showing a horizontal arch of 360 degrees and be of sufficient candle power so as to be visible against the background lighting at a distance of at least 2000 yards 90% of the nights of the year. In addition, the upstream and downstream channelward sides of the cofferdam had to be marked with red reflectors installed near the top of the cofferdam to reflect effectively the searchlight of an approaching vessel. ICC's responsibility, however, did not cease upon installation of the lights and reflectors, for it had to inspect and maintain all lights and reflectors to ensure that they were properly displayed.

Although the cofferdam originally may have had reflective tape or paint, by the time of the allision any strips of red reflec-

tive tape had peeled off, and the fluorescent paint had been affected by rust on the steel sheeting and, therefore, was not reflective. Despite the lack of reflective paint or tape, though, the cofferdam nevertheless was properly illuminated. The structure was lighted by two red or amber steady-burn battery lights,[12] located on the upstream and downstream corners, that were visible from 2000 yards at night and, therefore, were of sufficient intensity and brightness to satisfy the Coast Guard requirements. In fact, not only were the lights visible from the guardhouse located across the river on the south bank,[13] but they also could be seen at night by motorists crossing the Shippingsport Bridge, which was approximately one mile away from the cofferdam.

At the time of the allision, the cofferdam was surrounded by two crane barges, several small deck barges, and a work boat. In addition, the *M/V Becky R.* (a green and white boat) was moored on the downriver side of the cofferdam.

### D. The Trip and the Subsequent Allision

On the night of December 1, 1984, the *M/V Sunshine*, with its tow of eleven loaded barges,[14] was proceeding up the Illinois River at an appropriate speed of approximately 6–8 m.p.h. (against a 1½ m.p.h. current). Although there had been a number of difficult steers, including passage through narrow locks and bridges, Captain Wolfe successfully navigated the vessel past these obstacles and encountered no problems with the handling of the vessel and its tow.

At approximately 11:20 p.m., Joe Williams took over the controls from Captain Wolfe and began piloting the vessel at the Shippingsport Bridge. Williams held up for a southbound vessel and then successfully navigated through the Shippings-

---

**12.** ICC had complied with the Coast Guard regulations and periodically checked and replaced the batteries.

**13.** The watchman on duty, Carl Kepper, testified that on the night of the allision the lights were functioning properly and could be seen from the guardhouse.

**14.** The normal tow was 15 loaded barges; thus, the *M/V Sunshine* was not overloaded on the night of the allision. The vessel and its tow were approximately 1100 feet long and 105 feet wide.

port Bridge and proceeded up to the I.C. Railroad Bridge. There had been a lookout stationed on the bow of the tow as the vessel proceeded through the Shippingsport Bridge, since the passageway was rather narrow. But as the vessel reached the I.C. Railroad Bridge there was no additional lookout (other than Captain Williams, who was in the wheelhouse approximately twenty-eight feet off the deck), since lookouts were not customarily used at this bridge and there were no reported problems or other special circumstances in the area.[15]

Williams steered the vessel toward the bridge at about 3 m.p.h. (again, an appropriate speed), guiding himself by the navigational light located at approximately Mile 225.8. At this point Williams discontinued using the vessel's radar, since the structures in the area produced a shadowy, "ghosting effect" on the screen, rendering the radar inappropriate for use as a navigational guide. Instead, as Williams proceeded through the bridge he attempted to use his searchlight to spot the Coast Guard buoys that normally marked the sandbar. At that time, however, he realized not only that the black buoys were missing but also that he had steered the vessel too far to the left of center of the bridge to permit safe passage around the bend of the river; in other words, the vessel was too close to the north bank (and the sandbar).[16] He began steering to starboard, but soon thereafter the stern of the second barge out from the vessel on the port side (OR 3349) hit ground, as did the entire side of the first barge out (OR 3890). He then reduced the throttle to idle speed and continued trying to steer to starboard. As he proceeded

along the sandbar, he perceived what appeared to him to be a white boat (the *M/V Becky R.*) located on the downriver side of the cofferdam and, fearing that the head of the tow was dangerously close to the boat, steered to avoid hitting it.[17]

As he proceeded upriver, his tow began to swing to port because of the downstream current hitting the starboard side of the tow. He continued to steer to starboard, and as soon as his stern cleared the sandbar, he began backing his stern toward the north bank in an effort to swing the head of the tow to the right. These efforts came too late, however, because the lead barge on the port strand (USL 430) then allided with the cofferdam, causing $850,000 in damage.[18] The Coast Guard subsequently conducted an investigation of the allision, and although it had the authority to institute license suspension and revocation proceedings against a pilot for negligence, it chose not to level any charges against Williams in connection with the allision.

## III. JURISDICTION AND VENUE

This court has admiralty and maritime jurisdiction over this action pursuant to 28 U.S.C. § 1333(1) (1982). The defendant does not contest that venue is proper in the Northern District of Illinois or that this court has personal jurisdiction over it.

Logan has complied with the procedural requirements of the Limitation of Liability Act, 46 U.S.C.App. §§ 181–196 (Supp. I 1983), and this court therefore has jurisdiction to determine whether Logan is entitled to exoneration from liability or, in the alter-

---

15. Under Logan's policy lookouts normally were posted on the bow of the tow when there were exceptional circumstances, such as passage through narrow bridges and locks; in all other cases the captain had the discretion to post an additional lookout.

16. In fact, Captain Williams admitted that he had approached the I.C. Railroad Bridge too far to the left.

17. Although Williams admitted that he knew the cofferdam was in the vicinity, he claimed that he did not see it. As will be discussed later, however, the court believes that Williams

should have been able to see the cofferdam, given that its red lights were functioning properly. In any event, by steering to avoid hitting the *M/V Becky R.*, which was moored along the cofferdam on the downstream side, Williams already was doing all he could to avoid striking the area around the boat, including the cofferdam. *See infra* part V.B.

18. Both sides agree that the cofferdam was not damaged prior to the allision. The parties also have stipulated that the value of the cofferdam, including prejudgment interest to the date of the trial, was $850,000.

native, whether it is entitled to limit its liability pursuant to section 183.

## IV. COLLISIONS ON THE NAVIGABLE WATERS

### A. General Admiralty Principles

■ Liability for collisions on the navigable waters is governed by a series of presumptions and burden-shifting principles. As in other civil cases, the plaintiff has the burden of proving by a preponderance of the evidence that the defendant vessel was negligent and that this negligence was a proximate cause of the injury. When the plaintiff owns a stationary object hit by a moving vessel, however, the plaintiff can satisfy this initial burden and establish a prima facie case of negligence by invoking the "*Oregon* rule," which provides that a moving vessel which allides with a stationary object (such as an anchored vessel or other fixed object) is deemed to be presumptively at fault for the accident. *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); *see, e.g., Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794 (5th Cir.1977), *cert. denied sub nom. Furness Withy & Co. v. Bunge Corp.*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed. 2d 518 (1978); *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir.1967); *In re Texaco, Inc.*, 570 F.Supp. 1272, 1278 (E.D.La.1983). The burden of proof then shifts to the defendant vessel, which can overcome the presumption only by proving that 1) it actually was without fault, 2) the stationary object was at fault, or 3) the collision was inevitable. *See, e.g., City of Boston v. S.S. Texaco Tex.*, 773 F.2d 1396, 1398 (1st Cir. 1985); *Bunge Corp.*, 558 F.2d at 795.

■ On the other hand, if any party violates a statutory or regulatory rule designed to prevent collisions, that party is guilty of per se negligence and, under the so-called "*Pennsylvania* rule," has the burden of proving that its statutory fault was not a contributing cause of the accident:

> [W]hen ... a [party] at the time of a collision is in actual violation of a statu-

tory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the [party that violated the rule] of showing not merely that [its] fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). Thus, when the stationary object that has been struck by a moving vessel is in violation of a navigational statute intended to prevent collisions, the normal presumption of fault that attaches to the vessel under the *Oregon* rule is shifted back to the stationary structure:

> While such a structure may not be injured negligently by a passing vessel with impunity, nevertheless the vessel which strikes it is not presumptively negligent or careless, but the [structure] owner is presumptively at fault, unless he can show that the failure to comply with the requirements was not one of the factors or causes which contributed to the injury.

*United States v. Norfolk–Berkley Bridge Corp.*, 29 F.2d 115, 125 (E.D.Va.1928). Accordingly, the owner of the stationary object must prove that its failure to comply with the statutory or regulatory requirements could not have been one of the factors that contributed to the injury. *See, e.g., Complaint of Wasson*, 495 F.2d 571, 579–80 (7th Cir.) (applying *Pennsylvania* rule to bridges), *cert. denied sub nom. Toledo, P. & W. RR. v. Wasson*, 419 U.S. 844, 95 S.Ct. 78, 42 L.Ed.2d 73 (1974).

■ Once the plaintiff satisfies its burden of proving negligence and causation, the owner of the vessel may limit his liability to the value of the vessel and its tow if he can prove by a preponderance of the evidence that the negligent acts were not within his "privity or knowledge," as defined by 46 U.S.C.App. § 183.[19] *See,*

---

19. Section 183 provides, in pertinent part:

The liability of the owner of any vessel ...

*e.g., Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943); *Farrell Lines, Inc. v. Jones,* 530 F.2d 7, 10 (5th Cir.1976); *Waterman S.S. Corp. v. Gay Cottons,* 414 F.2d 724, 738 (9th Cir.1969); 3 *Benedict on Admiralty* § 41, at 5–2 (7th ed. 1986). Although the terms "knowledge" and "privity" are not susceptible to precise definition,

> [i]t has been said that "privity" means some fault or neglect in which the owner personally participates, and "knowledge" means personal cognizance or means of knowledge, of which the owner is bound to avail himself, of a contemplated loss or condition likely to cause or contribute to loss, unless proper means are adopted to prevent it.

*Id.* § 41, at 5–4 (footnote omitted); *see, e.g., In re Texaco,* 570 F.Supp. at 1278.[20]

This limitation principle is a maritime exception to the common law doctrine of *respondeat superior* (under which an employer is vicariously liable for the torts of his employees), since it imposes full liability on an owner only when he " 'personal[ly] participat[es] ... in some fault, or act of negligence, causing or contributing to the loss, or [has] some personal knowledge or means of knowledge, of which he is bound to avail himself of a contemplated loss [and does not] adopt[ ] appropriate means to prevent it.' " 3 *Benedict on Admiralty, supra* p. 18, § 41, at 5–3 (*quoting Lord v. Goodall, Nelson & Perkins S.S. Co.,* 15 F.Cas. 884, 887 (C.C.D.Cal.1877) (No. 8506), *aff'd,* 102 U.S. 541, 26 L.Ed. 224 (1881)); *see, e.g., Coleman v. Jahncke Serv., Inc.,* 341 F.2d 956, 957–58 (5th Cir.1965), *cert. denied sub nom. Jahncke Serv., Inc. v. Greater New Orleans Expressway Comm'n,* 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465 (1966). Such personal participation in the negligent acts can include, among other things, an owner's failure to hire a competent crew or to provide a seaworthy vessel. *See generally* 3 *Benedict on Admiralty, supra* p. 18, § 42, at 5–18 to –24 (discussion of seaworthiness).

Thus, the determination whether an owner is entitled to limitation of liability involves a two-step process. First, the claimant has the burden of identifying the vessel's acts of negligence that proximately caused the injury; if the plaintiff fails to prove negligence or causation, the owner is entitled to exoneration. If, on the other hand, the claimant satisfies this initial step, the burden then shifts to the owner to prove that he did not have knowledge or privity of those same acts of negligence; moreover, the fact that the owner had knowledge or privity of some acts of negligence is not enough, absent proof that those acts proximately caused the injury. If the owner satisfies his burden, he is entitled to limit his liability to the value of the vessel and its tow; otherwise, he is responsible for the full amount of the damage. *See, e.g., Farrell,* 530 F.2d at 10.

### B. Positions of the Parties

Relying on the *Oregon* rule, the plaintiff contends that it has established a prima facie case of negligence, since the *M/V Sunshine* was a moving vessel that struck the stationary cofferdam. The plaintiff further claims that the defendant has not overcome this presumption because Captain Williams' negligence in piloting the vessel was a proximate cause of the allision; Logan, according to ICC, is therefore liable for $850,000—the entire stipulated amount of the damage to the cofferdam, including prejudgment interest.

The defendant concedes that Captain Williams was negligent, but claims that the plaintiff also was at fault for not maintaining proper lights and reflective markings on the cofferdam, as required by the Coast Guard regulations. Invoking the *Pennsyl-*

---

for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner ... shall not, except in [cases of death or personal injury], exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

20. In cases of a corporate owner, the privity or knowledge of the owner is that of his employees vested with supervisory or discretionary authority, such as maritime superintendents. *See, e.g., In re Complaint of Seiriki Kisen Kaisha,* 629 F.Supp. 1374, 1387 (S.D.N.Y.1986); 3 *Benedict on Admiralty, supra* p. 18, § 41, at 5–3; *id.* § 42, at 5–14.

*vania* rule, the defendant claims that this alleged negligence was a statutory fault that shifts the burden of proof to ICC to prove that its negligence could not have been a contributing cause of the allision. ICC's failure to install or maintain the appropriate reflectors and lighting devices, the defendant contends, was also a proximate cause of the allision, because had the cofferdam been properly illuminated the pilot would have seen it and thereby avoided the allision. The defendant claims that under the comparative negligence principles applicable to admiralty actions, *see United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975), ICC was 40% at fault and its recovery therefore should be reduced from $850,000 to $510,000 (reflecting its damages less a sum equal to the percentage of fault that it contributed).

In the alternative, the defendant claims that it is entitled to limit its liability to the value of the *M/V Sunshine* and its tow—stipulated to be $200,000. Logan contends that the only fault committed by anyone associated with it was the pilot's navigational error, which, as a general rule, is not deemed to be within the owner's privity or knowledge. The plaintiff disagrees, identifying three other alleged acts of negligence within the privity or knowledge of Logan: 1) The failure to comply with the lookout rule by not posting an additional lookout on the bow of the tow, 2) the unseaworthiness of the vessel, and 3) the incompetence of the crew.

## V. EXONERATION

### A. ICC's Prima Facie Case

■ Both parties agree that ICC has established a prima facie case of negligence, since under the *Oregon* rule the *M/V Sunshine* is deemed to be presumptively at fault for striking the stationary structure. Moreover, both sides also agree (and this court finds) that Captain Williams was actually negligent in piloting the vessel, causing it to run aground on the sandbar and, ultimately, to strike the cofferdam. As Captain Williams himself admitted, he had approached the I.C. Railroad Bridge too far to the left of center to permit safe passage around the bend of the river; consequently, the vessel ran aground on the sandbar. Furthermore, once the vessel was grounded Williams, rather than stop immediately and attempt to back the vessel off the sandbar, instead chose to press forward and proceed along the bar, only to have the downstream current push the tow toward the bank and, ultimately, into the cofferdam.

As the pilot, Williams was chargeable with knowledge of all navigational conditions reasonably ascertainable by mariners experienced in navigating a particular waterway. *See Complaint of Valley Towing Serv.,* 629 F.Supp. 139, 145 (E.D.Mo.1985). Williams, who had extensive experience on this portion of the Illinois River and actual knowledge of the existence of the sandbar and cofferdam, therefore committed navigational error by failing to properly align the vessel as it approached the I.C. Railroad Bridge and by responding inadequately to the presence of the sandbar and the effects of the downstream current.

Thus, not only has the plaintiff established a prima facie case of negligence, but the defendant concedes that Captain Williams negligently navigated the vessel. The issue, then, is whether ICC itself was negligent and whether its negligence should reduce its recovery.

### B. Negligence Attributable to the Cofferdam

ICC, as the party building the bridge pier, had a duty to protect the cofferdam and other features of the pier, both for the protection of the structures themselves and for the protection of water-borne commerce. *See Complaint of Wasson,* 495 F.2d at 578–84 (duty of bridge owner). This duty included compliance with the Coast Guard regulations requiring that the cofferdam be marked with lights and reflective material. The defendant claims that ICC shares responsibility for the allision because it did not comply with these regulations; moreover, the defendant maintains that this alleged noncompliance constituted a statutory fault triggering application of the *Pennsylvania* presumption.

As this court already has found, however, the lights on the cofferdam were functioning properly and were visible from the Shippingsport Bridge (approximately one mile south of the cofferdam) and, therefore, should have been seen by Captain Williams as he approached the I.C. Railroad Bridge. Furthermore, although the lack of reflective paint or tape may trigger the *Pennsylvania* rule,[21] the court finds that ICC has overcome any presumption of per se negligence because the lack of reflective tape or paint "could not have been" one of the causes of the allision. *The Pennsylvania*, 86 U.S. (19 Wall.) at 136. First, the amber lights on the cofferdam were sufficiently intense to be seen from the *M/V Sunshine;* any reflective tape or paint, therefore, would not have enhanced appreciably the visibility of the cofferdam. In addition, the pilot admitted seeing the *M/V Becky R.* and steering to avoid hitting it; since this boat was moored close to the cofferdam on the downstream side, Williams already was doing all that he could to avoid striking the boat and the area around it, which would have included the cofferdam. Accordingly, the illumination of the cofferdam would not have altered Captain Williams' handling of the vessel.

Thus, the negligence of Captain Williams was the proximate cause of the allision, and any fault of ICC with respect to the lack of reflective tape or paint could not have contributed to the allision. Accordingly, Logan is not entitled to exoneration or to have the recovery reduced under comparative negligence principles. Logan therefore is liable for the full $850,000 in damage, unless it sustains its burden of proving that it is entitled to limit its liability pursuant to section 183.

## VI. LIMITATION OF LIABILITY

The plaintiff contends that Logan is not entitled to limit its liability because it had knowledge or privity of the three factors, in addition to the pilot's negligent navigation, that contributed to the allision: 1) The violation of the lookout rule; 2) the unseaworthiness of the vessel, including the alleged inadequacy of its radar and engine power; and 3) the incompetence of the crew.[22] The defendant, on the other hand, asserts that the only negligent acts committed by any of its employees were Captain Williams' navigational errors, which, as a general matter, are not within the privity or knowledge of a shipowner.

### A. The Lookout Rule

Often termed "the first rule of seamanship," *Marport, Inc. v. Stabbert & Assocs., Inc.*, 771 F.2d 1216, 1217 (9th Cir. 1985), the lookout rule requires that every vessel, including towboats, "at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 2005 (1982).[23] What constitutes a proper lookout depends upon the facts and circumstances of each case. *See, e.g., China Union Lines, Ltd. v. A.O. Andersen & Co.*, 364 F.2d 769, 783 (5th Cir.1966) ("The question of a proper look-

21. Both sides assume that the Coast Guard regulations are intended to prevent collisions and therefore fall within the ambit of the *Pennsylvania* rule.

22. Both sides agree that Donnie Willingham, as Marine Superintendent of Operations, exercised sufficient management and control over Logan's marine operations such that his knowledge or privity of negligent acts or conditions of unseaworthiness can be imputed to Logan.

23. Before 1980 there were three distinct sets of navigational rules governing 1) the Great Lakes; 2) the Western Rivers, including the Mississippi River and its tributaries, such as the Illinois River; and 3) the Inland Waters, which includ-ed the harbors, rivers, and inland waters other than the above. In addition, there were three more sets of regulatory rules called pilot rules, as well as special navigational light requirements for small commercial and recreational vessels. Because these seven sets of rules generated much confusion, Congress in 1980 attempted to unify and consolidate them into a single system, making them consistent with the international navigation regulations enacted with the Convention on the International Regulations for Preventing Collisions at Sea, 1972. *See* S.Rep. No. 979, 96th Cong., 2nd Sess. 1–2, *reprinted in* 1980 U.S.Code Cong. & Admin.News 7068, 7068–69. The lookout rule, Rule 5 of the Inland Navigational Rules Act of 1980, is codified at 33 U.S.C. § 2005.

out is one of fact to be determined from all of the circumstances....") *cert. denied,* 386 U.S. 933, 87 S.Ct. 956, 17 L.Ed.2d 805 (1967). Although on ocean-going vessels a lookout with no additional duties usually is required,

> [o]n vessels where there is an unobstructed all-round view provided at the steering station, as on ... towing vessels, or where there is no impairment of night vision or other impediment to keeping a proper lookout, the watch officer or helmsman may safely serve as the lookout. However, it is expected that this practice will only be followed after the situation has been carefully assessed on each occasion, and it has been clearly established that [it] is prudent to do so. Full account shall be taken of all relevant factors, including but not limited to the state of the weather, conditions of visibility, traffic density, and proximity of navigational hazards. *It is not the intent of these Rules to require additional personnel forward, if none is required to enhance safety.*

S.Rep. No. 979, 96th Cong., 2nd Sess. 8, *reprinted in* 1980 U.S.Code Cong. & Admin.News 7068, 7075 (emphasis added); *see, e.g., Marport,* 771 F.2d at 1218 ("[I]t is well-settled ... that the watch officer or helmsman may, under appropriate circumstances, serve as lookout from the wheelhouse of a tug in addition to performing other duties.") (citations omitted).

Thus, under appropriate circumstances, a captain or pilot of a towboat may serve as a lookout, and an additional lookout on the bow of the tow is not necessary unless required to enhance safety.[24] Failure to post an appropriate lookout is a statutory violation triggering the *Pennsylvania* rule. *See, e.g., First Nat'l Bank v. Material Serv. Corp.,* 544 F.2d 911, 918 (7th Cir. 1976); *Complaint of B.F.T. No. Two*

*Corp.,* 433 F.Supp. 854, 870 (E.D.Pa.1977). *But see In re White Cloud Charter Boat Co.,* 813 F.2d 1513, 1518 (9th Cir.1987) (violation of lookout rule not statutory fault), *rejected as dictum in Trinidad Corp. v. S.S. Keiyoh Maru,* 845 F.2d 818, 826 (9th Cir.1988); *Anthony v. International Paper Co.,* 289 F.2d 574, 581 (4th Cir.1961) (rejecting application of *Pennsylvania* rule to lookout rule).

The plaintiff claims that the captain or pilot of a towboat is not a proper lookout as a matter of law and that Captain Williams' failure to post an additional forward lookout was a statutory violation. According to the plaintiff, a forward lookout stationed at the head of the tow would have been at least 1000 feet closer to the "threshold of danger" than was the pilot in the wheelhouse; from this vantage point, the plaintiff asserts, the lookout could have observed the position of the tow relative to the navigable channel and the sandbar and then alerted the pilot in time to avoid the grounding and the subsequent allision. The plaintiff further contends that Logan's practice of delegating to its captains the discretion to post a lookout (absent exceptional circumstances, such as narrow bridges and locks) was a negligent act within the knowledge or privity of Logan.

The plaintiff, however, presented no evidence that a forward lookout was necessary under the facts and circumstances of this case. First, additional lookouts customarily were not used in the LaSalle Bridge area since, given the river conditions, a pilot in the elevated wheelhouse had an unobstructed view of the area.[25] Captain Williams had navigated in this area many times with only himself as a lookout, as had Captain Wolfe; in fact, when the plaintiff's expert, Captain Crutchfield, navigated this stretch of the Illinois River he

---

**24.** In the plaintiff's letter to the court dated February 18, 1988, the plaintiff concedes that the language of the Senate Report sanctions the practice of allowing the helmsman or watch officer to serve as lookout, but emphasizes that such a practice is appropriate only when all relevant factors indicate that it is prudent to do so.

**25.** Of course, industry custom or practice, while not dispositive of the question of negligence, is nevertheless relevant to that determination. *See, e.g., The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.) (L. Hand, J.), *cert. denied sub nom. Eastern Transp. Co. v. Northern Barge Corp.,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

himself did not station a forward lookout absent extraordinary circumstances.

In addition, on the night of the allision there were no exceptional conditions that should have prompted Captain Williams to post an additional lookout. The night was clear, the waters calm, and the trip uneventful. There were no prior notices or warnings of any problems along the river, and the vessel had experienced no difficulties in navigating even the more challenging areas of the river prior to approaching the LaSalle area. Given the good visibility and otherwise unremarkable conditions, Captain Williams had no reason to post an additional forward lookout. In short, the plaintiff has presented no evidence indicating that the failure to post an additional lookout was negligent. Under the facts and circumstances of this case, the pilot in the wheelhouse was an appropriate lookout within the meaning of the rule. *See, e.g., China Union Lines*, 364 F.2d at 783 (no fixed requirement that vessel maintain bow lookout under facts and circumstances presented); *Barrett Line v. Alamo Chem. Transp. Co.*, 271 F.Supp. 482, 485 (W.D.La. 1967).

Furthermore, even if the failure to post an additional lookout violated the lookout rule, Logan still would be entitled to limit its liability, since the decision whether to post a lookout is not a managerial concern. *See, e.g., In re Texaco*, 570 F.Supp. at 1286; *Complaint of B.F.T.*, 433 F.Supp. at 874 (management had no nondelegable duty to decide in all situations to post lookout). So long as an owner entrusts this decision to a competent crew, the determination whether to post a lookout is best left to the sound discretion of the pilot, who is aware of the on-the-scene conditions. If the decision not to post an additional lookout is negligent, it is a navigational error generally not within the privity or knowledge of the owner. *See, e.g., In re Complaint of Seiriki Kisen Kaisha*, 629 F.Supp. 1374, 1388 (S.D.N.Y. 1986); *In re Texaco*, 570 F.Supp. at 1286; *In re Louisiana*, 455 F.Supp. 272, 281 (E.D.La.1978); *Complaint of B.F.T.*, 433 F.Supp. at 874. *But see, e.g., Tug Ocean Queen, Inc. v. Tanker Four Lakes*, 398 F.Supp. 1062, 1070 (S.D.N.Y.1974).

This court concludes that even if the failure to post an additional lookout violated the lookout rule, Logan still would be entitled to limit its liability to the value of the vessel because, as the following sections demonstrate, Logan provided a seaworthy vessel and entrusted the navigational decisions to a competent crew.

### B. Seaworthiness of the Vessel

#### 1. General Principles

■ A shipowner has a nondelegable duty to provide a seaworthy vessel—that is, a ship reasonably fit for its intended use. Nevertheless, an owner is not obligated to furnish an "accident-free ship":

> The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. *The standard is not perfection, but reasonable fitness;* not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service.

*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960) (emphasis added); *see, e.g., Amerada Hess Corp. v. S/T Mobil Apex*, 602 F.2d 1095, 1097 (2d Cir.1979); *Farrell*, 530 F.2d at 11; *In re Texaco*, 570 F.Supp. at 1279.

■ There are two components to the determination of seaworthiness: the design, construction, and maintenance of the vessel itself, and the competence of its crew. The general rule is that the vessel "must be staunch, strong, well-equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion." *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir.), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); *see also In re Complaint of Seiriki Kisen Kaisha*, 629 F.Supp. at 1387; *In re Complaint of Delphinus Maritima, S.A.*, 523 F.Supp. 583, 593 n. 1 (S.D.N.Y.1981). In this case the intended use of the *M/V Sunshine* was, of course, to tow barges up and down the western rivers. The issue, therefore, is whether the *M/V Sunshine* was adequately designed, constructed, main-

tained, and equipped for this purposes and whether its crew was qualified to man the vessel.

### 2. *The Vessel*

The plaintiff first claims that the radar on board the vessel was not adjusted properly, producing the "ghosting effect" described by Captain Williams. As a result, the plaintiff contends, the radar screen did not reflect clearly the image of the cofferdam in time for the pilot to realize that the vessel was not aligned properly in the channel and to adjust his course accordingly.

The evidence at trial, however, demonstrated that the radar was functioning properly on the night of the allision. Furthermore, in the area around the cofferdam even properly functioning radar provided little guidance to pilots because of the so-called "ghosting effect" caused by the location of the I.C. Railroad Bridge, along with the close proximity of the cofferdam and its related floating equipment. Thus, the ghosting effect was not the result of any malfunction in the radar, but rather was an inevitable byproduct of the structures surrounding the cofferdam. Accordingly, the court concludes that Logan did not breach its obligation to provide appropriate radar equipment on the vessel.

The plaintiff next claims that the vessel's steering mechanism and rudder configuration rendered it unseaworthy by depriving it of the maneuverability and horsepower needed safely to escape the sandbar. (ICC does not contend that the design or manufacture of the vessel caused the initial grounding.) Specifically, the plaintiff asserts that the vessel's two flanking rudders on the outside wheels only (with none on the center wheel) diminished its rudder

power and steering responsiveness; moreover, the plaintiff claims that although the vessel was rated at 2700 horsepower, it could generate only about 2000 horsepower at the speeds obtaining from the Shippingsport Bridge to the sandbar. Once the tow grounded, the plaintiff claims, Captain Williams had no choice but to let the momentum of the vessel and tow continue forward into the cofferdam.

This court concludes, however, that the vessel's handling, maneuverability, and engine power were sufficient to render the vessel reasonably fit for its intended purpose. First, as this court already has found, the *M/V Sunshine*'s 2700 horsepower was more than adequate for an inland river towboat; the court specifically rejects the plaintiff's contention that the vessel was capable of generating only 2000 horsepower in the area of the allision. Furthermore, the plaintiff's own expert admitted that the average horsepower of towboats on the Illinois River is anywhere from 1800 to 2200 and that the normal tow is up to fifteen loads. In fact, the plaintiff's expert admitted that a boat with up to 4000 horsepower may not have been able to avoid hitting the cofferdam after the grounding.[26]

Second, its chimed hull and triple screw design combined to make the *M/V Sunshine* a responsive and maneuverable vessel. As Logan's expert, Captain Edgar Allan ("Wamp") Poe, testified, triple screw vessels generally are more maneuverable than single or double screw ships, and the *M/V Sunshine*'s hull design allowed more water to get to the wheels and thereby provided better steering and backing capability.[27]

---

**26.** In any event, the fact that a larger or more powerful vessel may have been able to escape the sandbar safely does not mean that the *M/V Sunshine* was unseaworthy; a shipowner, after all, does not have a duty to provide a perfect vessel—just one reasonably fit for its intended use.

**27.** This court found Captain Poe to be a very credible and knowledgeable witness. He started working on the river when he was 13 years old and received his first-class pilot's license in 1953; he has a first class pilot's license for the

lower Mississippi River, the upper Mississippi River, the Tennessee River, and the Cumberland River. In addition to his first-class pilot's license, Captain Poe has a master's license for all inspected vessels of all gross tons, and he has been to a two-to-three week school to obtain his radar observer's license. After reviewing the engine room logs and pilothouse logs of the vessel, and listening to the testimony of the witnesses, Captain Poe testified that the *M/V Sunshine* was maintained in good condition and was kept up in a seamanlike manner. In his

Evidence of the vessel's handling abilities can be found in its safety record on the Illinois River. The *M/V Sunshine* had operated for years on the Illinois River with a minimal amount of difficulty, handling up to fifteen loaded barges in all river conditions on many prior occasions. In fact, on the night of the allision the pilots of the vessel had performed at least fifteen difficult steers without any apparent problems; had the vessel not been seaworthy, the crew would have experienced problems in these more difficult areas prior to arriving in the LaSalle region. Furthermore, the fact that the vessel had run aground in the past is not necessarily evidence of unseaworthiness, since groundings and allisions are common in the industry (and on the Illinois River). They are not dispositive evidence of design or manufacturing defects,[28] and the *M/V Sunshine*'s record of groundings did not exceed that of the average (and seaworthy) towboat.

■ Thus, the court concludes that Logan fulfilled its duty to provide a mechanically sound and seaworthy vessel.[29] The allision was caused not by inadequate steering or horsepower, but by Captain Williams' negligent navigation. A negligent act by an otherwise competent crewman, however, does not render a vessel unseaworthy. *In re Complaint of Walker's Midstream Fuel Serv. & Co.*, 636 F.Supp. 339, 352 (W.D.Ky.1986). The question is whether the crew, even if negligent, was competent, experienced, and otherwise qualified to man the vessel.

### 3. *Competence of the Crew*

■ The determination whether a shipowner has furnished a competent crew depends upon several factors, including whether the captain, pilot, and navigator are licensed; whether they have satisfactory safety records; whether they are familiar with the vessel and the waters on which it travels; and whether they are adequately trained. Although a pattern of safety violations certainly would be evidence of incompetence, a single accident does not render a pilot or navigator incompetent, for even competent pilots occasionally experience groundings and allisions. Before an owner is determined to have privity or knowledge of a negligent act of a crew member, the owner must have been negligent in hiring or training the crew. *See, e.g., id.; In re Louisiana*, 455 F.Supp. at 281–82.

The plaintiff has pointed to no evidence indicating that any crew member of the *M/V Sunshine* was incompetent. Instead, the evidence demonstrates that Logan, through Donnie Willingham, hired and trained competent crews to man its vessels, including the *M/V Sunshine*. For example, as this court already has found, *see supra* part II.B., Perry Wolfe and Joe Williams were licensed pilots with many years of experience on the Illinois River and on the *M/V Sunshine* in particular;

opinion, the *M/V Sunshine* was mechanically sound and reasonably fit to tow the 11 loaded barges on the Illinois River at the time of the accident.

**28.** Nor are they necessarily indications of incompetent, as opposed to negligent, captains and pilots. *See infra* part VI.C.3.

**29.** The only testimony alleging that the vessel was unseaworthy was that of the plaintiff's expert, Captain Mickey Crutchfield. This court, however, found Captain Poe's testimony to be far more credible. Most of Crutchfield's experience was on the lower Mississippi, and he was on the *M/V Sunshine* only for a 52-day period in April and May 1984. Although he claimed that the *M/V Sunshine* was not well maintained, he admitted that the five other Logan vessels on which he had worked for two years were well

kept and had no unusual problems; it seems unlikely that all of Logan's boats were seaworthy with the exception of the *M/V Sunshine*. Furthermore, although Crutchfield claimed that 1) the vessel did not have enough power to remove its tow after a grounding, 2) the steering levers were hard to manipulate, and 3) the vessel did not have enough rudder power when backing, Crutchfield experienced only two minor incidents on the vessel. Furthermore, during those 52 days, Crutchfield safely navigated the *M/V Sunshine* northbound through the Marseille's Lock on May 5 and 16 with no problems. In addition, Perry Wolfe navigated southbound at Mile 231 on April 24 and May 7 without problems, and Williams navigated southbound at Mile 231 on May 20 without grounding or problems. Thus, the court does not believe that Captain Crutchfield's claims of unseaworthiness are credible.

with respect to Captain Williams, it is especially telling that the Coast Guard, which is authorized to institute suspension and revocation proceedings against a pilot's license, fully investigated the incident and chose not to level any charge against him. Other members of the crew, including the engineer, Jerry Johnson, likewise were competent and capable men. Thus, at most one of the crew members, Captain Williams, was negligent in navigating the vessel; this act of negligence, though, does not render him incompetent and thereby deprive Logan of its ability to limit its liability.

#### C. Navigational Error

 Since this court has concluded that Logan was not negligent in providing a seaworthy vessel and a competent crew, the only actionable acts of negligence committed by anyone associated with Logan were Captain Williams' navigational errors in misjudging the position of the vessel with respect to the I.C. Railroad Bridge and in responding inadequately to the grounding and the force of the downstream current. Such navigational errors rarely are within the privity or knowledge of the owner and, therefore, generally are not sufficient to deprive an owner of limitation of liability, so long as the owner manned the vessel with a competent crew:

> If the loss is due to an error of navigation or management, the shipowner must show that the navigators are licensed as the law may require and present evidence that it was warranted in believing them to be competent men with knowledge of their duties. The shipowner must instruct its servants generally as to their duties. The vessel must be properly manned, but a deficiency in manning which has no causative connection with the loss is immaterial.

> . . . The navigation of the vessel is under the absolute control of her master, whose powers and duties are largely regulated by statute and who is responsible for the proper navigation and management of the vessel. This has been strongly stated, both before and since

the advent of wireless and radio, and no case has been found where a shipowner, individual or corporate, has been denied limitation because of a liability arising out of an error of management or of navigation on a voyage committed by an employee whom the owner was warranted in believing to be competent with knowledge of his duties.

3 *Benedict on Admiralty, supra* p. 18, § 42, at 5–23 to –24, –25 to –26 (footnotes omitted); *see, e.g., In re Complaint of Mac Towing, Inc.,* 670 F.2d 543, 548 (5th Cir. 1982); *Farrell,* 530 F.2d at 10; *In re Magnolia Marine Transp. Co.,* No. 84–2038, slip op. at 13, 1986 WL 15674 (D.Kan. Dec. 10, 1986) ("The burden of proving lack of privity and knowledge is minimal in a case involving navigational errors. . . ."); *In re Complaint of Walker's Midstream,* 636 F.Supp. at 352 ("A competent pilot, however, may make errors without rendering a vessel unseaworthy or imperiling limitation if the owner lacks privity or knowledge of the pilot's negligent acts."); *American Commercial Lines v. United States,* 590 F.Supp. 816, 824 (E.D.Mo.1984) ("[T]he 'errors in navigation or other negligence by [the] master or crew are not attributable to [the owner] on *respondeat superior* for limitation purposes.'") (*quoting Tittle v. Aldacosta,* 544 F.2d 752, 756 (5th Cir. 1977)), *judgment vacated in part on other grounds sub nom. In re American Commercial Lines, Inc.,* 781 F.2d 114 (8th Cir. 1985); *In re Valley Line Co.,* 564 F.Supp. 612, 616 (E.D.Mo.1984) ("A navigational error in the way of miscalculation by a master resulting in a collision by a barge being towed by a river towboat does not affect the owner's right to limit his liability."). Since Logan provided a seaworthy vessel with a competent crew, the navigational errors of the otherwise competent Captain Williams were not within the privity or knowledge of Logan. Accordingly, Logan is entitled to limit its liability to the stipulated value of the *M/V Sunshine* and its tow on December 1, 1984: $200,000.

#### VII. CONCLUSION

For the foregoing reasons, the court finds that Captain Williams' navigational

errors were the sole proximate cause of the allision; because these negligent acts were not within the privity or knowledge of Logan, however, Logan is entitled to limit its liability to the value of the *M/V Sunshine* and its tow on the night of the allision—stipulated to be $200,000. Accordingly, the court enters judgment for the plaintiff in the amount of $200,000, plus prejudgment interest and costs. The plaintiff must calculate the prejudgment interest and costs, submit its proposal to the defendant, and, if the parties agree on the figure, file the proposal with this court by July 21, 1989. If the parties cannot stipulate to the amount, the court will set the matter down for further hearing.